UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

SARMAD RAFI,

     Defendant.

_____/

Case Number: 2:25-cr-20224-NGE-DRG

Hon. Judge Nancy G. Edmunds

## DEFENDANT'S SENTENCING MEMORNADUM

Defendant Sarmad Rafi, through counsel, respectfully submits this memorandum in advance of sentencing on Count 3 of the Information, charging him with Smuggling Goods from the United States, contrary to 18 U.S.C. § 554. Mr. Rafi respectfully requests that this Court impose a sentence of time served or, in the alternative, a significant downward variance from the advisory Guideline range pursuant to 18 U.S.C. § 3553(a), and a downward departure under U.S.S.G. § 2M5.2 Application Note 1, and § 5K2.0.

## SUMMARY OF ARGUMENT

Mr. Rafi's offense involved no threat to any national security or foreign policy interest of the United States, as it concerned low-value, commercially available firearm components and ammunition bound for Canada. At just 21 years old, his actions reflected youthful immaturity rather than criminal intent, and his subsequent conduct demonstrates exceptional rehabilitation and character. He has cooperated with authorities, accepted responsibility, and shown genuine remorse, warranting a sentence of time served or a significant downward variance and departure.

## I.    PROCEDURAL HISTORY AND CASE BACKGROUND

Mr. Rafi was arrested on January 27, 2025, following a Homeland Security Investigation into cross-border shipments of firearm components. He was charged by information with four

counts, including three counts of smuggling under 18 U.S.C. § 554 and one count of false statements under 18 U.S.C. § 1001.

On July 14, 2025, he pled guilty to Count 3 pursuant to a Rule 11 agreement; the remaining counts will be dismissed at sentencing. He has been in continuous federal custody since his arrest and has no prior criminal convictions.

The Presentence Investigation Report ("PSR") sets the offense level at 23 (base level 26 under § 2M5.2(a)(1), minus 3 for acceptance of responsibility), and a Criminal History Category I, resulting in an advisory guideline range of 46 – 57 months.

## II.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

On January 27, 2025, Mr. Rafi, then 21 years old, crossed from Canada into Port Huron, Michigan to pick up several mail-order packages from SCC Parcel Pickup, a commercial parcel depot near the border. This was not his first visit—records show that he had previously used the same service to receive online purchases for his university firearm club and for personal projects. The Homeland Security Investigations ("HSI") reports note that similar parcel businesses are commonly used by Canadian residents for convenience when ordering items unavailable in Canada.

After collecting his packages, Mr. Rafi made several routine civilian stops in Port Huron— visiting a grocery store, a Dunkin' Donuts, and a local sporting goods shop where he lawfully purchased two 500-round boxes of .22-caliber ammunition. When returning to Canada later that afternoon, he was directed to outbound inspection by Customs and Border Protection ("CBP"). HSI agents, who had been monitoring the parcel pickup were present and approached Mr. Rafi.

At the beginning of the interview process with HSI agents, Mr. Rafi exhibited hesitation and selective disclosure, as he was not immediately forthcoming about the full scope of items he

had acquired in the United States or the nature of his cross-border activity. Mr. Rafi provided a narrow explanation for his trip, citing grocery purchases and a pickup for a friend. He did not immediately disclose the additional items—including firearm components, body armor plates, and ammunition—in part because he did not fully grasp the legal seriousness of failing to declare them. This early lack of candor was not rooted in malicious intent, but rather a combination of naivete, poor judgment, and anxiety about the legal process unfolding before him.

He later admitted that one of his motivations for withholding information was to avoid paying duties on the goods he brought back into Canada, an infraction he mistakenly believed would not carry significant consequences beyond a fine. However, once shown the seriousness of the matter, Mr. Rafi shifted into a cooperative and transparent posture wherein he gave explanations of his purchasing and resale activity, he disclosed his username for gun posts where he was selling parts, he did not object to a search of his vehicle and he described where the items could be located in his vehicle, he disclosed the combination to get the key for his gun safe at his home in Canada and disclosed the items that he had at his home, and he offered to provide email records and receipts for his activities. His disclosures allowed investigators to recover, catalog, and assess the entirety of the merchandise and supported the efficient execution of the Canadian search warrant.

When agents asked why he had not declared the items, he acknowledged that he knew he was required to do so and stated plainly, *"I didn't want to pay the duty fee."* As he later explained to probation, the price difference between U.S. and Canadian firearm accessories led him to believe he could resell parts at a small profit within his university shooting club—an entrepreneurial impulse made in ignorance of the gravity of export restrictions.

So, his attempt to evade export controls was a means for a university student to turn a modest profit rather than a sophisticated scheme to traffic dangerous weapons. He used his personal vehicle and every transaction bore his real name and phone number. This transparency stands in stark contrast to typical firearms trafficking activity, which often involves shell entities, concealed transactions, bulk shipments, and distribution to unlicensed or prohibited individuals. The government's own discovery materials acknowledge that the purchases were made through commercial, legitimate online retailers (JSD Supply, Right to Bear, B&T USA, Vet Sales & Transfers) and that none of the items were restricted military weapons. Mr. Rafi made no such attempts at concealment or operational security, which underscores that his conduct, while unlawful, lacks the hallmarks of organized trafficking.

Mr. Rafi's purchases did not include complete, operable firearms, nor did he attempt to assemble or traffic in functional weapons. The evidence shows that Mr. Rafi was transporting individual components and accessories — not complete or operable firearms — for a combination of personal recreational use and occasional resale through lawful Canadian channels. These components included non-serialized items such as slides, handguards, barrels, detent pins, and a shotgun shell holder, all of which are widely available in the U.S. and not, in and of themselves, considered firearms under U.S. law. When asked by investigators, Mr. Rafi stated that he purchased some parts for personal use, and some parts for resale. He made clear that he did not sell completed and operable firearms—just kits and components—and he explained that he would vet potential buyers to confirm they had proper licensing for particular items.

Mr. Rafi's interest in firearms and related components should be understood within the context of a lawful and recreational hobby, rather than any illicit or nefarious endeavor. He is a licensed gun owner in Canada, employed part-time at a licensed sporting goods store, and serves

as the president of a university-affiliated gun club at Western University. In this role, he has organized and participated in target shooting events and educational activities related to firearm safety and sport shooting. His familiarity with firearm components and terminology arises from these legitimate pursuits. The parts he acquired — slides, barrels, and accessories — are commonly used by hobbyists for maintenance, customization, or resale through lawful platforms like GunPost.ca. His purchasing behavior reflects the interests of a dedicated enthusiast seeking affordability and availability, not that of someone attempting to build or traffic weapons. Framing Mr. Rafi's conduct through the lens of his active involvement in Canada's legal sport shooting community demonstrates that his actions, while misguided, were rooted in a personal passion for firearms as a hobby — not as a business or criminal enterprise.

### III.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

#### a.  Background and Family

Mr. Rafi was born in Mississauga, Ontario in 2003 to a working-class immigrant family. He is described in the PSR as a respectful, educated, and family-oriented young man who assisted his aging parents and served as a caretaker for his mother, who suffers from severe depression and anxiety. His sister, Maha Tariq, has written eloquently to this Court describing his compassion, intelligence, and extraordinary potential, "*He is the kindest, sweetest in nature person I know . . . deeply patriotic and holds a great admiration for the values and opportunities that the United States represents.*"

#### b.  Education and Academic Excellence

At the time of his arrest, Mr. Rafi was a third-year honors psychology student at Western University with a 3.7 GPA and a consistent record of Dean's List honors. His transcript corroborates stellar grades in courses such as Psychopathology (89%), Data Science Concepts

(91%), and United States History: 1865 to Present (92%). While detained, he has continued self-education in data science and programming—requesting Java, Python, and R textbooks to continue learning despite incarceration.

### c.   Civic and Community Engagement

Letters from peers and mentors show that Mr. Rafi has long engaged in civic life. He volunteered for the Conservative Party of Canada, knocking on thousands of doors, conducting voter data analysis, and earning commendations from senior political figures. He also obtained St. John Ambulance certification as a Medical First Responder and taught Stop the Bleed courses in partnership with the London Health Sciences Centre. These activities reveal a genuine commitment to public service and safety—values utterly at odds with criminal intent.

### d.   Character and Support Network

Mr. Rafi appears before this Court not as a hardened offender but as a young man whose life has been marked by empathy, service, and intellectual curiosity—traits attested to consistently by family, friends, mentors, and community figures.  The attached character letters contain a cross-section of voices from Canada's academic, civic, and literary communities, all of which portray Sarmad as a man of integrity whose conduct in this case was an isolated departure from his true character.

### i.   Testimony of His Family

Sarmad's sister, Maha Tariq, writes at length about his generosity, intelligence, and leadership.  She recalls how her brother's "*kindness is the most powerful strength, gentle, and unforgettable,*" and that "*he is immediately well liked by anyone he meets.*"  She describes a lifetime pattern of compassion— "*Sarmad is the type of person who would say hello to the elderly and has stopped mid-sentence to run across the street to help senior citizens with their*

*bags*." These examples, drawn from daily life rather than grand gestures, reveal a deeply prosocial temperament.

Ms. Tariq also provides evidence of intellectual maturity and civic engagement uncommon for someone of his age. She recounts his extensive volunteer work for the Conservative Party of Canada, his participation in campus service clubs, and his efforts to educate peers on firearm safety and mental-health awareness. As she put it, "*He has project managed and raised money for and organized countless charity drives . . . All of these esteemed Western organizations are actively following Sarmad on social media. This pattern of constructive leadership demonstrates that Sarmad is well-liked among his peers and showcases his influence, organizational, and interpersonal judgment necessary to guide successful University programs*."

Importantly, she anchors her plea for leniency in developmental science, noting that "*research in developmental neuroscience indicates that Sarmad's prefrontal cortex, at age 21, has not yet reached full maturation . . . through his coursework, he will atone these actions and serve our communities tenfold.*" Her letter thus situates his conduct within the recognized framework of youthful impulsivity and capacity for reform.

Sarmad's father, Mohammad Rafi, a poet and community organizer, echoes this sentiment. He describes his son as following in his footsteps as *"a poet, author, social activist, and philanthropist,"* emphasizing that Sarmad has been writing and reciting poetry since age 13. He highlights Sarmad's "*passion for taking part in federal and provincial politics*," noting that he is "*the youngest member of the Conservative Party of Canada and has access to the Ontario Premier and other national politicians.*" He highlights Sarmad's leadership as president of the Western University shooting club, where he *"raised funds for charity and was dedicated to building a*

*responsible and educated community,"* coordinating donations to veterans' organizations and sponsoring safety courses for students.

### ii.   Support from Community Mentors, Friends, and Classmates

Among the community endorsements, Mr. Pervaiz Salahuddin, founder of the Toronto literary society FOTH, offers a compelling independent perspective:

> "Sarmad's poetry often reflects a philosophical stance toward life, showcasing his depth and intellect . . . He is a trustworthy and intelligent young man, deeply engaged with both local and geopolitical matters . . . This behavior is entirely inconsistent with the character of the young man I have known for the last fifteen years."

Mr. Salahuddin's statement not only corroborates Sarmad's long-standing involvement in literary and intellectual circles but also demonstrates that respected community elders perceive this offense as anomalous.

Nick Ross, a coworker and friend of Sarmad's father, states that upon first meeting Sarmad he, "*instantly felt that I could trust him . . . that says a great deal about both his demeanor and his character.*" He talks about Sarmad's community work at Victoria Hospital, working with mentally ill patients, holding fundraisers to help students in need, and helping to organize a program to allow for free emergency response training for fellow students at Western University. He states with confidence that "*Sarmad has this strong support system of family and friends that will help to guide him in his upward aim in making a positive impact on his community.*"

Kelly Muszka, the mother of Sarmad's friend Nik, states that "*Sarmad demonstrates . . . the traits that reflect strong moral character, accountability, and the potential for rehabilitation.*" She notes his sense of responsibility and willingness to engage in the democratic process by volunteering in elections, supporting local candidates, and participating in community initiatives

and cheers his career aspirations in the medical field as a reflection of his genuine desire to serve others.

Many of Sarmad's peers from Western University also contributed letters of support and spoke of his academic dedication and role as the president Western University shooting club.

Nikolas Kapsalis wrote that Sarmad Rafi "*is a genuinely good person who has made a real and lasting impact on the people around him*." He explained that Sarmad "*played a major role in running the Western University Firearms Club . . . the driving and organizational force behind the club's structure and activities*." According to Mr. Kapsalis, "*his approach to firearms was thoughtful and responsible . . . a hobby rooted in discipline, technical skill, and community, not something reckless or dangerous*." He emphasized that "*after he was detained, the club more or less fell apart . . . [t]hat showed just how much it had depended on him*." Mr. Kapsalis concluded, "*He is someone with a good heart, strong values, and so much potential to still make a meaningful contribution in the world*."

Adair Garcia-Rivera wrote that when he first met Sarmad, "*he was beyond friendly and welcoming . . . talking to him was like talking to an old friend*." Working alongside him as a club executive, he "*learned just how dedicated and committed he was,*" adding that "*he has always demonstrated maturity and a strong moral compass*." Mr. Garcia-Rivera concluded that "*this incident does not reflect the core of who he is as a person*."

Josh Muszka described Sarmad as "*a defining influence throughout my university career,*" explaining that "*his work ethic and encouragement have pushed me to improve myself and achieve academic and personal goals in ways I never would have imagined*." He emphasized Sarmad's continued self-discipline while detained: "*He is using this period as an opportunity to improve himself and best prepare for the future after his release*."

Ali Esmaeili recalled that Sarmad "*went out of his way to help me get acquainted with the city and was someone who I could rely on when I struggled with my first-year courses*." He wrote that Sarmad is "*one of the most charismatic and compassionate individuals that I have ever met*," and that as president of the university's firearms association he "*led with passion, discipline, and commitment to the safety of all members*." Mr. Esmaeili closed by stating, "*My impression of him remains high . . . his actions do not reflect the desire for any criminal purpose but rather derive from his passion for sports shooting*."

Cindy Cui wrote that she came to "*admire his leadership and dedication*," and that Sarmad "*has been one of the most dedicated and passionate members of the [Western University shooting club], pouring more time and energy into it than anyone else I've seen*." She added that under his leadership the club "*grew to 269 members… nearly tripling last year's count*," and credited him for "*fostering inclusion, connection, and community*." Despite the circumstances, she affirmed, "*I do not believe that Sarmad is a bad person… I genuinely think he understands the severity of his actions and deeply regrets them*."

Nick Ross wrote that Sarmad "*has shown great remorse for his actions, as well as being proactive about serving his time thus far by reading books, exercising and engaging in healthy habits*." He added, "*I strongly believe that Sarmad has this strong support system of family and friends that will help to guide him in his upward aim in making a positive impact on his community*."

Michael Quick stated that "*this was a mistake that goes against who Sarmad is and who I know he still is to this day*." He wrote, "*I want it [make] clear that he is a good person who has made a terrible mistake*." Mr. Quick explained that Sarmad was elected president of the Western

University Firearms Club because "*we believed he was the most fit and would work the hardest to serve the club well.*"

The letters submitted on behalf of Mr. Sarmad Rafi present a consistent portrait of a high-achieving, respectful, and civic-minded young man whose conduct in this case stands in sharp contrast to his established character. Friends, classmates, and mentors describe him as intelligent, compassionate, and dependable; a student who earned the respect of his peers through discipline and kindness. Several Western University students emphasized his leadership and professionalism as president of the campus firearms club, noting that "*his approach to firearms was thoughtful and responsible . . . a hobby rooted in discipline, technical skill, and community, not something reckless or dangerous.*" Others highlighted his habit of mentoring younger students, volunteering in hospital programs, and bringing warmth and comfort into a room. His sister and community mentors echoed those observations, portraying him as a young man who "*demonstrated maturity and a strong moral compass*" and who has shown deep remorse and insight since his arrest. Collectively, the writers attest that Mr. Rafi's actions were an aberration in an otherwise law-abiding and purposeful life, and that he possesses the integrity, support system, and determination to resume his education and contribute productively to his community.

### iii.   Demonstrated Rehabilitation and Remorse

Mr. Rafi's conduct since arrest—studying, reflecting, and maintaining family communication—demonstrates meaningful rehabilitation. His friends and family detail his ongoing study of programming and data science while incarcerated, his intention to return to Western University, and his resolve not to squander the opportunity if granted leniency. His tone is introspective and future-oriented, evidencing genuine growth rather than rote contrition.

When given the opportunity, Mr. Rafi will address the court to accept full responsibility for his actions, expresses sincere remorse, and reflect on the lessons he has learned during his detention. He will detail how he is using this time to study, reflect, and prepare to return to school, emphasizing his commitment to personal growth and to living a law-abiding, purposeful life. Mr. Rafi will express the gratitude for his family's support and asks for the opportunity to rebuild his future through education and service to others.

### e. Leadership and Safety Advocacy in the Western University Firearm Association

Contrary to any impression that Mr. Rafi's case reflects fascination with weapons or disregard for law, the letters submitted by his peers and family demonstrates the opposite. His involvement with firearms in Canada was strictly educational, regulated, and community-oriented—a continuation of his lifelong interest in civic participation and public safety. According to multiple letters, Mr. Rafi was elected President of the Western University Firearm Association (also referred to by peers as the Western University gun club or shooting club), a sanctioned extracurricular organization with nearly 500 active members.

As president, Mr. Rafi did not merely promote recreational shooting, he worked to institutionalize responsible ownership by coordinating student completion of the Canadian Firearms Safety Course and ensuring that new members received instruction on transport, storage, and legal compliance. Mr. Rafi used his position to integrate firearm education with broader public-service goals. He partnered with recognized advocacy bodies such as the Canadian Coalition for Firearm Rights (CCFR) and the Canadian Shooting Sports Association (CSSA) to deliver guest-speaker events and to secure safety literature for students. His sister confirms that he was a paying member of both organizations, noting:

"These memberships reflect Sarmad's dedication to understanding and adhering to Canada's firearms regulations, as well as his commitment to promoting safe and responsible practices within the sporting community. His voluntary participation in these regulated organizations demonstrates his respect for legal frameworks and his dedication to engaging with firearms in a lawful, responsible manner."

Through fundraising drives and charity raffles, the club under his presidency donated proceeds to veterans' rehabilitation programs and mental-health initiatives—linking the culture of sport shooting with service to those affected by trauma. Letters from both family and peers describe Mr. Rafi as an educator and mentor rather than an enthusiast driven by risk. Mr. Muszka observes that Sarmad's "*efforts have provided hundreds of students with a new hobby, creating opportunity for social connection while introducing safe shooting and firearm handling practices.*" He was known on campus for enforcing a zero-tolerance policy toward unsafe behavior and for coordinating with local ranges to verify compliance with provincial and university regulations.

Ms. Tariq summarizes the perception held by students and administrators alike: "*All of Sarmad's peers are extremely hard working, academic Gen Z, who espouse conservative values and are respected individuals of their University,*" Sarmad's "*constructive leadership demonstrates [he] is well liked among his peers and showcases his influence, organizational, interpersonal judgment necessary to guide successful University programs.*"

This record of structured, lawful, and philanthropic firearm involvement powerfully distinguishes Mr. Rafi's case from the archetypal arms-smuggling scenarios envisioned by § 2M5.2. Rather than seeking to traffic or weaponize, he used his knowledge to educate others and promote compliance. His offense—failing to declare parts purchased online—was a misguided extension of an otherwise legitimate academic and sporting pursuit, not evidence of criminal orientation. Such context is precisely the type of "mitigating circumstance not adequately

considered by the Guidelines" warranting downward departure under U.S.S.G. § 5K2.0(a)(2). It also bears directly on the § 3553(a)(1) factor, demonstrating that "the history and characteristics of the defendant" militate toward leniency and rehabilitation rather than prolonged incarceration.

## IV.   ADVISORY GUIDELINE RANGE AND GROUNDS FOR DOWNWARD DEPARTURE

The Presentence Investigation Report ("PSR") sets the offense level at 23 (base level 26 under § 2M5.2(a)(1), minus 3 for acceptance of responsibility), and a Criminal History Category I, resulting in an advisory guideline range of 46 – 57 months. However, for the following reasons, Defendant argues that a significant downward departure is warranted.

### a.   Guideline Framework of U.S.S.G. § 2M5.2

Section 2M5.2(a)(1) sets a base offense level of 26 for export violations involving United States Munitions List (USML) items. Of the items that Mr. Rafi attempted to export across the border, it is the body armor—not the weapon parts—that exposes Mr. Rafi to the above-referenced guideline section. As referenced above, U.S.S.G. § 2M5.2 is implicated for export violations involving USML items,[1] but the USML does not include the weapons parts and components, or the ammunition, that Mr. Rafi attempted to export. This is a point that undersigned counsel and the government agreed on during the pendency of this matter. However, the armor plates that Mr. Rafi possessed is listed on the USML as personal protective equipment, according to a United States Department of State memo provided to undersigned counsel.[2] Further, the application of the higher base offense level of 26 described in § 2M5.2(a)(1), rather than the lower base offense level

---

[1] The USML includes firearms using caseless ammunition, fully automatic firearms to .50 caliber, Precision Guided Firearms, fully automatic shotguns, silencers, mufflers, and sound suppressors, barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for careless ammo and fully automatic weapons. https://www.law.cornell.edu/cfr/text/22/121.1

[2] Category X(a)(1): Body armor providing a protection level equal to or greater than NIJ RF3, 22 C.F.R. 121.1

of 14 described in § 2M5.2(a)(2), is only due to Mr. Rafi's possession of more than 500 rounds of ammunition.

So, his attempted export of the armor plates and ammunition is the only thing that puts him in the recommended guideline range of 46 – 57 months. As explained above, Mr. Rafi purchased the ammunition for use in an upcoming shooting competition held by the sports shooting club at Western University, and only because he saw a better price than what was available in Canada and he wanted to save the club some money. The armor plates were purchased as personal protection equipment for himself and other sports shooters on the range to protect from harmful ricochets. These facts are most unfortunate for Mr. Rafi, because otherwise, the offense would fall under § 2M5.2(a)(2) with a base offense level of 14. This would result in an adjusted base level of 11 (due to the 3-point reduction for acceptance of responsibility) and a resulting applicable guidelines range of 8-14 months.

### b. Argument for downward departure pursuant to U.S.S.G. §2M5.2 (2nd paragraph of application note 1)

It is important to note that the base offense level of U.S.S.G. § 2M5.2 assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. The second paragraph of application note 1 states:

> "The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted. In the case of a violation during time of war or armed conflict, an upward departure may be warranted."[3]

---

[3] USSG §2M5.2, comment. (n.1)

It is helpful to note the Sentencing Commission's reason for adding this language to the note was to: "*better distinguish the more and less serious forms of offense conduct covered.*"[4] This case qualifies as the "unusual case" described above in the second paragraph of Application Note 1 to § 2M5.2—where the offense conduct posed no risk of harm, or potential harm, to any security or foreign policy interest of the United States—and Defendant submits that the circumstances of this case represent a less serious offense than similarly situated Defendants.

Typically, a defendant seeking a downward departure bears the burden of proof by a preponderance of the evidence showing eligibility for the departure.[5] In most instances, the defendant is required to present evidence tending to prove the *existence* of a fact or set of facts warranting the departure. However, the downward departure contemplated in the second paragraph of Application Note 1 under U.S.S.G. §2M5.2 requires the defendant to prove the *non-existence* of a fact or set of facts entitling him to the departure. Particularly, that his conduct *did not* pose a risk of harm, or potential harm, to "*a security or foreign policy interest of the United States.*" To accomplish this requirement, Defendant will argue herein how the facts in his case are distinguished from the facts in cases where the government argued that a particular defendant's conduct *did* pose a risk of harm, or potential harm, to a security or foreign policy interest of the United States.

In *United States v Stines,*[6] the court sentenced the defendant to 46 months' imprisonment and two years of supervised release—a sentence at the low end of the Guidelines range. Defendant argued that his criminal conduct was not harmful and did not have the potential to be harmful to a security or foreign policy interest of the United States. The district court disagreed and reasoned

---

[4] USSG §2M5.2, Amendment 337, https://www.ussc.gov/guidelines/amendment/337
[5] *United States v. Sachdev,* 279 F.3d 25 (1st Cir. 2002); *United States v. Onofre-Segarra*, 126 F.3d 1308 (11th Cir. 1997).
[6] *United States v Stines,* 34 F4th 1315, 1318 (CA 11, 2022).

that a downward departure was unwarranted because Stines's conduct had the potential to harm national security, referencing political instability and violence in Haiti, the proximity of Haiti to the United States, and observing that Stines appeared to have been working in concert with the Haitian police force, who were at times "engaged in fire-fights" with the Haitian government.[7] Noting the "extremely volatile political situation" in Haiti, the court found that Stines's conduct affected the foreign policy interests of the United States, which militated against granting a downward departure.[8]

In *United States v Sero*, the Defendant was convicted of exporting weapons and other defense articles from the United States to the Philippines and sentenced to 40 months' imprisonment. In arguing that his conduct did not pose a risk or potential risk of harm to a security or foreign policy interest of the United States, he stated that he "sold [the defense articles] to the right side or that he was not selling directly to the insurgents."[9] The court rejected Sero's downward departure argument in finding that Sero's conduct posed a general risk to United States foreign policy, and stated that a "citizen cannot pick and choose the firearm vendees that he will wish to deal with to the detriment of the policies of the State department."[10]

In *United States v Elashyi*, the defendant was convicted of export control violations related to the sale of computer parts to Libya. While that case contemplated U.S.S.G. § 2M5.1, that guideline also contains an application note that allows the court to depart based on the degree to which the violation threatened a security interest of the United States.[11] In that sense, the facts in *Elashyi* may enlighten this court about what is considered a threat to a national security interest of

---

[7] *United States v Stines*, 34 F4th 1315, 1321 (CA 11, 2022).
[8] *Id.* at 1318.
[9] *United States v Sero*, 520 F3d 187, 191–92 (CA 2, 2008).
[10] *Id.* at 191–92.
[11] USSG § 2M5.1, comment. (n.2).

the United States. The *Elashyi* court stated that the President, through an Executive Order, determined that Libya posed an "unusual and extraordinary threat to the national security and foreign policy of the United States" and determined that it was a threat to national security to allow the unlicensed and unauthorized sale of certain goods to anyone in those countries, resulting in an embargo covering the exportation of virtually all goods to Libya.[12] According to a U.S. Department of Justice press release, defendant *Elashyi* was sentenced to 48 months' imprisonment.[13]

In *US v Galvan-Revuelta*,[14] the defendant plead guilty to the unlicensed export of munitions and was sentenced under U.S.S.G. § 2M5.2. When the defendant attempted to drive across the border, Customs agents stopped and searched the vehicle, finding 10,181 cartridges of various caliber firearms ammunition. The district court found that the defendant's offense conduct posed no national security risk, and in accordance with U.S.S.G. § 2M5.2, departed downward from the applicable guideline range of 33-41 months and imposed instead a prison term of 24 months.

In each of the above-reverenced cases, the court found that a defendant's conduct posed a threat to a national security interest of the United States in situations where weapons were exported to insurgents in countries in close proximity to the United States and marred by political instability and violence (*Stines*), where weapons were exported to countries not in close proximity to the United States but were used in violent conflicts (*Sero*), and where computer parts were exported to a country under embargo due to an Executive Order that determined that the country posed an unusual and extraordinary threat to the national security of the United States (*Elashyi*). The facts of Mr. Rafi's case could not be more different than those situations.

---

[12] *United States v Elashyi*, 554 F3d 480, 508 (CA 5, 2008)
[13] Available at https://www.justice.gov/archive/tax/usapress/2002/txdv02elashyi_sen_pr.html
[14] *United States v Galvan-Revuelta*, 958 F2d 66, 67 (CA 5, 1992).

Canada is a long-standing US ally, not to an adversarial or sanctioned nation (aside from recent tariff disputes with the current US administration). The United States and Canada share the most integrated defense relationship in the world: they are partners in NORAD, allies in NATO, and maintain bilateral defense production and export treaties that permit the lawful exchange of most non-sensitive arms components between private parties with minimal regulatory risk. Exporting these items to Canada—where the recipient market is heavily regulated, where firearms are registered, and where U.S. law enforcement routinely cooperates with Canadian authorities— does not implicate any national defense, intelligence, or counter-proliferation concerns. No rational reading of "national security interest of the United States" encompasses the movement of consumer-grade firearm parts between two allied democracies whose military and law enforcement agencies share real-time intelligence systems.

Further, there is no evidence of diversion, trafficking, or connection to hostile actors that could themselves represent a threat to a United States security or foreign policy interest. Investigative reports show that Mr. Rafi purchased all items under his own name, paid with traceable means, and arranged for delivery to a well-known parcel service used by Canadians to collect U.S. consumer goods. There was no attempt to disguise, reroute, or obscure the nature of the items or their destination. No evidence suggests that he acted on behalf of, or sold to, prohibited persons or foreign governments—he stated he made purchases for his own personal use and for limited sales to persons in Canada that had legal right to purchase such items after he confirmed their license status in real time using Canadian Firearms Program individual webservices portal.[15] There is no evidence that any of the items he sold were used to perpetrate violence; rather, it appears that his sales were made to other hobbyists. His conduct reflects a naïve regulatory

---

[15] Found at https://rcmp.ca/en/firearms/individual-web-services

infraction, not a calculated smuggling enterprise. As his statement to investigators confirmed, he failed to declare the items primarily to avoid paying customs duties, not to evade export control scrutiny.

Moreover, Mr. Rafi's cross-border trips were infrequent and involved limited quantities of consumer-level parts and ammunition. There is no indication that any item was ever used, transferred, or resold in a way that affected U.S. interests. The value of all seized materials was minor compared to cases involving organized trafficking or military-grade exports. This scale and context place Rafi's conduct far outside the national security concerns the guideline was designed to address.

The offense did not undermine U.S. foreign policy or diplomatic objectives. The purpose of §2M5.2 is to punish conduct that undermines U.S. strategic interests—such as violations involving embargoed states, weapons proliferation, or circumvention of export controls in sensitive regions that lead to the weapons being used for violence. Mr. Rafi's conduct implicated none of these. To the contrary, the cooperative nature of U.S.-Canadian law enforcement demonstrates that this offense had no adverse foreign-policy impact whatsoever. Canadian authorities were informed and assisted U.S. investigators. The case produced no diplomatic repercussions, media attention, or policy implications—further evidence that it carried no security dimension.

In sum, Mr. Rafi's case presents the quintessential example of an offense that, while technically unlawful, posed no realistic threat to the national security or foreign-policy interests of the United States. His actions involved consumer-level goods, destined for a cooperative ally, carried out without concealment, organization, or intent to harm. Under Application Note 1 to

U.S.S.G. §2M5.2, the Court should recognize this as an "unusual case" warranting a downward departure from the guideline range.

### c.   Mitigating Circumstances under § 5K2.0 and § 3553(b)

The court shall impose a sentence of the kind, and within the determined guideline range, unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.[16] This is reiterated in U.S.S.G. § 5K2.0(a)(2), and consequently, Defendant argues that there are additional grounds for departure as explained below.

### i.   Defendant's Youth (§ 5H1.1)

A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense. The applicable guideline located at § 5H1.1, specifically states that "risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences . . . and familial relationships"[17]

Mr. Rafi was 21 years old at the time of the offense—an age at which neurological research shows the prefrontal cortex, responsible for judgment and impulse control, remains underdeveloped (a point that § 5H1.1 is clearly influenced by). Letters from his sister and academic mentors confirm that Mr. Rafi was a bright but impressionable university student, more motivated by peer identity within his campus shooting club than by profit or ideology. His conduct was the product of naïveté, not criminal disposition—precisely the kind of developmental lapse that § 5K2.0 contemplates as mitigating when maturity and judgment are still forming.

---

[16] 18 U.S.C. § 3553(b)(1)
[17] U.S.S.G. § 5H1.1

Additionally, the PSR describes a modest, working-class upbringing marked by instability and significant parental health challenges:

> "His parents… suffer from chronic medical and mental health issues… His mother has severe depression and anxiety, arthritis, and thyroid issues… His father experiences chronic back pain and carpal tunnel syndrome… Rafi reportedly helped around their home, completing tasks his parents were unable to handle on their own."[18]

This environment forced Rafi into adult responsibilities at a young age—caring for his parents while lacking mature emotional guidance. His sister confirmed that the family "moved to a new neighborhood each year, renting cramped basement apartments," and that despite their hardships, Rafi "was the new kid every year" but excelled academically. That kind of social dislocation can delay the formation of mature social judgment and heighten a young person's desire for belonging and validation—both key developmental risk factors recognized in sentencing psychology literature.

### ii. Collateral Consequences – Immigration and Academic Sanctions (§ 5K2.0)

Mr. Rafi's conviction has triggered severe collateral consequences beyond the guideline sentence. As a Canadian citizen, he faces automatic removal from the United States and a long-term bar on reentry. He will likely lose his U.S. educational opportunities and medical-school eligibility—sanctions that far exceed those faced by typical defendants.

Courts have recognized such collateral effects as legitimate mitigating factors under § 5K2.0 when they render the cumulative punishment substantially more severe than contemplated by the Guidelines and state that "a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence."[19]

---

[18] *United States v. Sarmad Rafi*, Presentence Report at 9-10
[19] *United States v Smith*, 27 F3d 649, 655; 307 US App DC 199 (1994)

Given Mr. Rafi's youth and educational trajectory, these lifelong consequences already fulfill many of the penal objectives of the Guidelines.

### iii.   Extraordinary Family and Community Ties (§ 5H1.6)

While family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted,[20] an offender characteristic or other circumstance identified in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination only if such offender characteristic or other circumstance is present to an exceptional degree.[21] Courts have also stated that "a district court may depart from an applicable guidelines range once it finds that a defendant's family ties and . . . community ties are so unusual that they may be characterized as extraordinary."[22]

Here, letters from family, professors, and community members demonstrate that Mr. Rafi enjoys an extraordinary support system committed to guiding his rehabilitation; these attestations demonstrate a robust safety net ensuring compliance and reentry success, making lengthy imprisonment unnecessary.

### iv.  Exceptional Acceptance of Responsibility and Post-Offense Rehabilitation (§ 5K2.0)

Although Mr. Rafi already receives a three-level reduction under § 3E1.1, his post-offense conduct exceeds the norm for acceptance of responsibility. Since his arrest, he has admitted his wrongdoing repeatedly, both to investigators and the Probation Office, written a detailed personal letter that he intends to read to the court expressing genuine remorse, and continued his university education from custody, requesting programming textbooks and formulating a plan to re-enroll

---

[20] U.S.S.G. § 5H1.6
[21] U.S.S.G. § 5K2.0(a)(4)

[22] *United States v Canoy*, 38 F3d 893, 906 (CA 7, 1994)

immediately upon release. This sustained self-improvement and introspection go beyond the ordinary degree of acceptance contemplated by § 3E1.1 and warrant an additional reduction under § 5K2.0(a)(4).

Courts have recognized such extraordinary rehabilitation as grounds for downward departure, stating that "post-offense rehabilitation may provide an appropriate ground for departure only when present to such an exceptional degree that the situation cannot be considered typical of those circumstances in which an acceptance of responsibility adjustment is granted."[23]

## V.    APPLICATION OF THE § 3553(a) FACTORS

Defense counsel herein advocates for a variance from the recommended sentencing range and argues that a below-guidelines sentence of time served is warranted and supported by an analysis of the circumstances of the offense and the history and characteristics of the defendant, as well as the other § 3553(a) factors analyzed herein.

### a.   The History and Characteristics of the Defendant (§ 3553(a)(1))

Mr. Rafi's conduct was technical, minimal, and devoid of any national-security consequence. The items exported were commercially available civilian components and .22 caliber ammunition used for recreational sport shooting—not controlled defense articles or classified materials. The destination was Canada, a NATO ally whose defense and intelligence apparatus are fully integrated with those of the United States. He did not operate clandestinely, falsify documents, or act on behalf of prohibited entities. He used his own name, a legitimate parcel-pickup service, and made all purchases from ordinary online vendors. When questioned by agents, he was cooperative and forthcoming once he understood the gravity of the offense, and he acknowledges that he failed to declare items to avoid duties—not to conceal contraband.

---

[23] *United States v Brock*, 108 F3d 31, 35 (CA 4, 1997).

These facts place his case far from the "core" smuggling scenarios contemplated by § 2M5.2—those involving weapons proliferation, embargo violations, or export to adversarial states. The conduct was non-violent, non-covert, and non-strategic, and thus warrants leniency.

At the time of the offense, Mr. Rafi was 21 years old, a Canadian university student in his third year at Western University pursuing an honors degree in Psychology with minors in Health Science and Data Science. He maintained a 3.7 GPA, earned placement on the Dean's Honor List, and was preparing for graduate or medical studies.

Letters from his sister and community members attest that he is intellectually gifted, civic-minded, and deeply remorseful. He volunteered for political campaigns, taught first-aid courses, and served as president of his university's gun safety and outdoors club. These activities portray not a trafficker, but a young man whose interest in firearms was academic and recreational, and grounded in lawful sporting culture.

He has no prior criminal history, no record of violence, and has shown consistent introspection and rehabilitation during detention—pursuing programming textbooks, continuing his studies, and expressing remorse for disappointing his family. His youth and clean record strongly predict a low risk of recidivism.

### b. The Need for the Sentence to Reflect Just Punishment, Deterrence, and Protection of the Public (§ 3553(a)(2))

Mr. Rafi has already served nine months in federal custody—his first and only experience with incarceration. That experience, combined with a felony conviction, forfeiture of property, and immigration consequences, constitutes substantial punishment for a young first-time offender.

The immigration consequences in particular will have a significant impact on Mr. Rafi. Although he is a citizen of Canada, Mr. Rafi has long expressed a deep admiration for the United States and the principles it represents—liberty, opportunity, and civic responsibility. His family

reports that he kept a United States flag in his room as a symbol of his aspiration to live, study, and work here, and his academic and professional goals were directed toward contributing to American society, including through future service to U.S. military veterans. Mr. Rafi understands that, as a result of his conviction, he may now be permanently barred from entering the United States—a nation he has long respected and hoped to join. That collateral consequence alone constitutes a profound and enduring sanction for a young man whose intentions were never hostile to the interests of the United States but rather rooted in respect for its values and opportunities.

Additional incarceration would serve no meaningful deterrent purpose. The deterrent message has already been sent—even minor export infractions can have serious legal consequences, and because the conduct was non-violent and motivated by naïveté rather than malice, the need to "protect the public" is virtually nonexistent.

### c.  The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))

A sentence within the recommended guideline range of 46 – 57 months would create a significant sentencing disparity when considering the facts at issue in this case in comparison to the cases described herein and the sentences those defendants received (*Stines*, 46 months; *Sero*, 40 months; *and Elashyi*, 48 months). Mr. Rafi's actions are not analogous to the acts described in those cases—the export and proliferation of weapons and goods to embargoed states that lead to the weapons being used for violence. Rather, Mr. Rafi exported commercially available consumer parts for personal use in association with the University of Western Ontario's Firearm Association and occasional resale to other hobbyists that were legally permitted to possess such goods.

Additionally, as described herein, the attempted export of weapons parts and components themselves is not what brought Mr. Rafi within the domain of § 2M5.2(a)(1), it was the inclusion the armor plates used as personal protective equipment on the range and the ammunition intended

for use in the club's upcoming shooting competition. Without the inclusion of these items, Mr. Rafi would be facing an applicable guidelines range of 8-14 months—akin to sentence that is being requested here.

### d.   The Defendant's Rehabilitation and Future Contribution (§ 3553(a)(2)(D))

Mr. Rafi's record demonstrates a capacity for reform and an eagerness to redirect his talents toward constructive ends, and the letters submitted on his behalf describe an exemplary academic, civic volunteer, caretaker son, and document diligence and empathy rarely seen in defendants this young. While in custody, he has continued his studies, maintained communication with professors, and developed an academic plan to resume classes upon release. He aspires to pursue graduate work integrating data science and clinical psychology—fields focused on understanding and helping others, not harming them.

This sustained commitment to education, paired with a strong family support network, makes further imprisonment counterproductive to rehabilitation, so any further imprisonment risks derailing his education and rehabilitation.

### e.   The Kinds of Sentences Available.

As noted in the PSIR, a statutory maximum custodial term of ten years, to be followed by a term of supervised release of up to three years, is available to the court in this matter. In lieu of imprisonment, the defendant is statutorily eligible for a probation term of between one and five years. In the Rule 11 agreement, the parties agreed that the court should impose a 1-year term of supervised release (nonreporting in the event the defendant is removed from the United States) following service of any custodial sentence imposed.

### f.   The Need to Provide Restitution to Any Victims of the Offense.

There is no restitution claimed in this case.

### g. § 3553(a) Conclusion

Viewed through the § 3553(a) framework, the advisory guideline range derived from § 2M5.2 overstates the seriousness of Mr. Rafi's conduct. He is a first-time offender who acted without malicious intent, in a context devoid of national-security implications, and who has demonstrated extraordinary potential for positive reintegration. A downward variance—to a sentence of time served or probationary supervision—is therefore "sufficient but not greater than necessary" to achieve the purposes of sentencing. Such an outcome honors both the letter and spirit of § 3553(a), reflecting proportionate punishment, meaningful deterrence, and faith in rehabilitation over retribution.

## VI. SUMMARY AND CONCLUSION

For all the foregoing reasons, Defendant argues that a sentence of time served, followed by one year of supervised release (non-reporting if removed), satisfies the purposes of 18 U.S.C. § 3553(a). Such a sentence recognizes the seriousness of the offense, promotes respect for the law, provides just punishment, and avoids unwarranted disparity.

Mr. Rafi has learned a profound lesson, as his sister wrote, *"This will mark the most pivotal time in Sarmad's life."* Justice tempered with mercy will ensure that lesson endures.

Zachary Glaza
Counsel for the Defendant